UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| SCOTT MATHEWS, | § | No. SA:14–CV–566–DAE |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| T. DAVIDSON, individually; | § | |
| N. MARTE, individually; and | § | |
| S. KERWATH, individually, | § | |
| | § | |
| Defendants. | § | |

ORDER ADOPTING THE MAGISTRATE'S
REPORT AND RECOMMENDATION

Before the Court are Plaintiff Scott Matthew's Objections (Dkt. # 39) to Magistrate Judge John Primomo's Report and Recommendations (Dkt. # 37) regarding Defendants T. Davidson, N. Marte, and S. Kerwath's July 27, 2015 Motion for Summary Judgment (Dkt. # 30).  Defendants filed a response to the Objections on September 18, 2015 (Dkt. # 40).  Pursuant to Local Rule 7(h), the Court finds this matter suitable for disposition without a hearing.  After reviewing the Objections and the supporting and opposing memoranda, the Court **ADOPTS** the Memorandum and Recommendation.  (Dkt. # 37.)

1

BACKGROUND

I.    Factual Background

This lawsuit arises out of alleged excessive force by three officers of the San Antonio Police Department ("SAPD"), which took place early in the morning of April 14, 2013. Many of the facts alleged are in dispute; at this stage of litigation, the Court must accept the facts as recounted by the Plaintiff. See Poole v. City of Shereveport, 691 F.3d 624, 627 (5th Cir. 2012). Accordingly, the facts are recounted here as they are alleged in the summary judgment evidence submitted by Plaintiff.

According to Christie Mathews, who was Plaintiff's girlfriend at the time of the incident and is now his wife, Plaintiff had been battling depression and anxiety in the week leading up to the April 14 incident. ("C. Mathews Dep.," Dkt. # 34-3, 24:6–26:13; 29:3–29:16.) Plaintiff had been taking prescription medication including Valium, smoking marijuana, and drinking more than six beers per day for approximately a week leading up to the April 14 incident. (Id.)[1]

---

[1] During her deposition, Ms. Mathews gave the following testimony:

> Mr. Ralls: [D]uring that week, there's some notes in the record that Mr. Mathews had been taking his medication, I guess, for depression as well as consuming some alcohol; is that right?
> . . .
> Ms. Mathews: He was drinking, I mean, every day. And I don't know like the medication, how much he was taking

> . . .
>
> Mr. Ralls: When you say 'a lot,' do you think that's more than a six-pack in one day?
>
> Ms. Mathews: Yeah
>
> Mr. Ralls: More than a 12-pack in one day?
>
> Ms. Mathews: I don't know if he drank more. I'm not sure. Definitely more than six.

(C. Mathews Dep. 24:24–25:25.)

Significantly, Plaintiff testified to the following substance use prior to the incident:

> Mr. Ralls: And so during that week would you have also been taking 25 Vicodin per day?
>
> Mr. Mathews: Yeah.
>
> Mr. Ralls: and during that week, you would have been drinking about half a bottle of vodka, 80 proof vodka per day?
>
> Mr. Mathews: Yeah. And if I couldn't get vodka, I'd drink beer instead.
> . . .
>
> Mr. Ralls: Do you remember what kind of beer you were drinking at that time?
>
> Mr. Mathews: Anything with high alcohol volume like Ice House and Steel Reserve. Steel Reserve would be my favorite.
>
> Mr. Ralls: Do you know what the alcohol content of Steel Reserve is?
>
> Mr. Mathews: Yeah. Like 8 percent by volume.
> . . .
>
> Mr. Ralls: Were you smoking marijuana on a regular basis then?

Late in the evening of April 13, 2013, Plaintiff repeatedly told Ms. Mathews, who was sitting across the room from him at the time, "I want to feel hurt. I want to feel pain" and repeatedly asked her to punch him in the face. (C. Mathews Dep. 30:2–30:24.) This occurred for about an hour. (Id. 31:21.) Approximately one hour later, Plaintiff sat next to Ms. Mathews on the couch and pleaded with her to punch him in the face. (Id. 33:2–33:23.)

Very alarmed, Ms. Mathews went into the bedroom she shared with Plaintiff, closed and locked the door; around 1:00 a.m., she called Plaintiff's mother on her cell phone and asker her and Plaintiff's father to come to the house. (C. Mathews Dep. 35:5–36:18.) Ms. Mathews was crying and very upset throughout the phone call. (Id. 36:8–36:25.)

---

. . .

Mr. Mathews: Maybe one or two joints per day, I would say. It's hard for me to track amounts of marijuana, but yeah.

. . .

Mr. Ralls: Okay. And what do you think your Valium consumption was during that period of time?

Mr. Mathews: If you're too drunk to remember, it's probably not a good signal. Not a good sign at all. If you're downing Valium with beer, it's not a good thing.

Mr. Ralls: And you were doing that?

Mr. Mathews: Yeah. I was downing Valium with beer. It's just stupid.

("Mathews Dep., Dkt. # 30, Ex. A; 21:14–23:21.)

4

At some point after Ms. Mathews called Plaintiff's parents, Plaintiff "broke the door" to the bedroom where Ms. Mathews was waiting for Plaintiff's parents. (C. Mathews Dep. 39:9–39:23.) Ms. Mathews heard Plaintiff beating on the door, but was not sure whether he opened it "with a kick or arms or running against it." (Id. 39:21–39:23.)

Around 1:30 in the morning of April 14, 2013, Ms. Mathews decided to leave the home. (C. Mathews Dep. 41:23–41:25.) When Ms. Mathews was about two steps away from the front of the door, Plaintiff, who was standing very close behind her, wrapped his arms around her from behind and asked her not to leave. (Id. 43:2–44:13.) Ms. Mathews told Plaintiff to stop, and he let go and followed her out the front door.[2] (Id. 44:14–20.) Ms. Mathews was crying and tears were streaming down her face. (Id. 43:7–43:8; 44:14–44:15.) When Ms. Matthews walked out the door, she saw that there were three police officers walking towards the house holding flashlights and guns, and initially thought they were Plaintiff's parents. (Id. 44:21–46:9.)

As the police officers approached, they screamed at Ms. Mathews and Plaintiff to put their hands up; once the couple complied, the officers holstered their weapons. (C. Mathews Dep. 48:1–49:10.) According to Ms. Mathews,

---

[2] Plaintiff stated in his deposition that at the time he left the door, his right arm was around Ms. Mathews' shoulders "in kind of a hooking motion." (Mathews Dep. 33:20–34:3.) Because Plaintiff did not include this testimony as part of his summary judgment evidence, it will not be considered here.

5

Officer Davidson brushed Ms. Mathews to the side, and grabbed one of Plaintiff's arms; Officers Kerwath and Marte[3] grabbed his other arm. (Id. 49:16–52:7.) Ms. Mathews watched as two officers, one of whom was Officer Davidson, took Plaintiff to the ground, where he landed face-down on a dirt path paved with stepping stones. (Id. 52:11–54:15.)

Once Plaintiff was on the ground, Ms. Mathews states that Officer Davidson went to his right side, one male officer went to his left side, and the other male officer kneeled on Plaintiff's back and began handcuffing him. (C. Mathews Dep. 55:11–56:9.) Ms. Mathews states that while Plaintiff was being handcuffed, Officer Davidson was hitting him in the ribs and said "take that mother fucker."[4] (Id. 56:8–57:6.) Ms. Mathews states that she saw the other male officer raising his hand, and saying "Do you like that, asshole?" (Id. 56:8–57:8.) Ms. Mathews did not ever see the male officer hit Plaintiff. (Id. 56:13–56:15.) Ms. Mathews was uncertain about the number of times Plaintiff was struck by either officer, and was

---

[3] Ms. Mathews was unable to distinguish between the two male officers, whom she described as having a having shaved heads and a similar build, height, and shoulder width. (C. Mathews Dep. 51:10–51:13; 55:6–55:8)

[4] Plaintiff's complaint stated that he sustained injuries to his chest and abdomen. (Dkt. # 1 ¶ 8.) However, Plaintiff has not made any other allegation or submitted any evidence that he suffered an injury to his chest, abdomen, or ribs as a result of the officers' actions. Further, the medical records Plaintiff submitted to the Court do not indicate that Plaintiff suffered any bruising or other injury to his chest, ribs, or abdominal region. (See Dkt. # 34–4 at 29 (noting bruising on arms and legs)).

uncertain as to where Plaintiff was struck.  Ms. Mathews does not believe that either officer used anything but their hands to hit Plaintiff.  (Id. 59:14–59:24.)

Once Plaintiff was handcuffed, the officers stood him up, then sat him down on the ground.  (C. Mathews Dep. 59:25–60:10.)  Ms. Matthews observed that Plaintiff couldn't hold his head up, and that the officers did not touch Plaintiff again after that point.  (Id. 60:10–60:13; 63:25–64:12.)  Ms. Mathews states that the officers called EMS after noting drool or saliva coming from Plaintiff's mouth, believing it was blood.  (Id. 65:11–65:19.)  Officer Davidson repeatedly interviewed Ms. Mathews about domestic abuse, and Ms. Mathews denied that Plaintiff had abused her in any way.  (Id. 61:15–63:9.)  Soon afterwards, EMS arrived and put Plaintiff into an ambulance.  (Id. 66:2–66:5.)

Later that day, Plaintiff underwent a craniotomy at the hospital to evacuate a subdural hematoma.[5]  (Dkt. # 34-4 at 9–12.)  Plaintiff's medical notes from the following day state that Plaintiff's recovery could be affected due to a "mild form of vonWillibrands disease" and the fact that he had "been taking a lot of aspirin."  (Dkt. # 34-4 at 15.)  Ms. Mathews testified that Plaintiff was placed into a medically-induced coma and remained in the hospital for a couple of weeks after the April 13, 2013 incident.  (C. Mathews Dep. 71:23–72:16.)

---

[5] A subdural hematoma is the medical terminology for a blood clot.

An excessive use of force claim was initially raised against the City of San Antonio as well as the three instant Defendants.  On December 11, 2014, the City of San Antonio was dismissed pursuant to motion.  (Dkt. # 21.)

## LEGAL STANDARD

I. Review of a Magistrate Judge's Memorandum and Recommendation

Any party may contest the Magistrate Judge's findings by filing written objections within fourteen days of being served with a copy of the Memorandum and Recommendation.  28 U.S.C. § 737(b)(1)(C).  The objections must specifically identify those findings or recommendations that the party wishes to have the district court consider.  Thomas v. Arn, 474 U.S. 140, 151 (1985).  A district court need not consider "[f]rivolous, conclusive, or general objections." Battle v. U.S. Parole Comm'n, 834 F.2d 419, 421 (5th Cir. 1987) (quoting Nettles v. Wainwright, 677 F.2d 404, 410 n. 8 (5th Cir. 1982), overruled on other grounds by Douglass v. United States Auto Ass'n, 79 F.3d 1415 (5th Cir. 1996)).

The Court must conduct a de novo review of any of the Magistrate Judge's conclusions to which a party has specifically objected.  See 28 U.S.C. § 636(b)(1)(C) ("[A] judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.").  On the other hand, findings to which no specific objections are made do not require a de novo review; the Court need only

determine whether the Memorandum and Recommendation is clearly erroneous or contrary to law. United States v. Wilson, 864 F.2d 1219, 1221 (5th Cir. 1989).

Here, Plaintiff objects, albeit broadly, to the manner in which the Magistrate analyzed his claim under the Fourth Amendment. Accordingly, this claim will be analyzed de novo. (See Dkt. # 39 at 2–3.) Plaintiff does not make any specific objections to the Magistrate's findings regarding the state law claims; there, the Magistrate's analysis will be reviewed for clear error.

II.   Motion for Summary Judgment

Summary judgment is proper when the evidence shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251–52 (1986). The main purpose of summary judgment is to dispose of factually unsupported claims and defenses. Celotex Corp. v. Catrett, 477 U.S. 317, 323–24 (1986).

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. Id. at 323. If the moving party meets this burden, the non-moving party must come forward with specific facts that establish the existence of a genuine issue for trial. ACE Am. Ins. Co. v. Freeport Welding & Fabricating, Inc., 699 F.3d 832, 839 (5th Cir. 2012). In deciding whether a fact issue exists, the Court "may not make credibility

determinations or weigh the evidence."  Tibler v. Dlabal, 743 F.3d 1004, 1007 (5th Cir. 2014) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)).  However, "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment."  Brown v. City of Hous., 337 F.3d 539, 541 (5th Cir. 2003).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Hillman v. Loga, 697 F.3d 299, 302 (5th Cir. 2012) (quoting Matsuhita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

## DISCUSSION

I. Whether Defendants Are Entitled to Qualified Immunity

In their Motion for Summary Judgment, Defendants plead the defense of qualified immunity.  Qualified immunity shields government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate a clearly established statutory or constitutional right."  Kinney v. Weaver, 367 F.3d 337, 349 (2004) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Meadours v. Ermel, 483 F.3d 417, 422 (5th Cir. 2007).  A right is clearly established where "a reasonable official would understand that what he is doing violates that right."  Kinney, 367 F.3d at 349–50; Pearson v. Callahan, 555 U.S. 223, 231 (2009) (qualified immunity protects government officials from

"from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known" (quoting Harlow, 457 U.S. at 818)).  This protection "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  Pearson, 555 U.S. at 231.

Like sovereign immunity, qualified immunity is not "a mere defense to liability," but "an immunity from suit" which "is effectively lost if a case is erroneously permitted to go to trial."  Pearson, 555 U.S. at 231 (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)).  Accordingly, at the summary judgment stage, a Court should focus "not on the merits of [Plaintiff's] claim, but on [officers'] entitlement to qualified immunity."  Poole, 691 F.3d at 630.  Where defendants plead qualified immunity and move for summary judgment, the Court must determine (1) whether Plaintiff has produced "sufficient evidence to raise a genuine dispute of material fact suggesting the officers' conduct violated an actual constitutional right" id. at 627 (quoting Brumfield v. Hollins, 551 F.3d 322, 326 (5th Cir. 2008)); and (2) "whether the right was clearly established at the time of the defendant[s'] alleged misconduct" Ontiveros v. City of Rosenberg, Tex., 564 F.3d 379, 382 (5th Cir. 2009).  The plaintiff bears the burden of negating the

11

defense of qualified immunity. Brumfield, 551 F.3d at 326; Bazan ex rel Bazan v. Hidalgo Co, 246 F.3d 481, 489 (5th Cir. 2001).

Here, Plaintiff claims that Defendants violated his Fourth Amendment rights by using excessive force when they were called to his home. ("Compl.," Dkt. # 1 ¶ 7.) At all times, Plaintiff unquestionably "had a clearly established right to be free from excessive force." Deville v. Marcantel, 567 F.3d 156, 169 (5th Cir. 2009) (quoting Tarver v. City of Edna, 410 F.3d 745, 753–54 (5th Cir. 2005)).

When qualified immunity is pled at the summary judgment stage in a case alleging excessive use of force, the plaintiff bears the burden of "negat[ing] the defense" by showing that he suffered "(1) an injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." Poole, 691 F.3d at 382 (quoting Ontiveros, 564 F.3d at 382); Marcantel, 567 F.3d at 167; Freeman v. Gore, 483 F.3d 404, 416 (5th Cir. 2007)).

The excessiveness and reasonableness of an officer's actions should be analyzed "in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Poole, 691 F.3d at 628. The use of force should be evaluated "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham v. Connor, 490 U.S. 386, 396 (1989). Finally, when considering whether the force used was

excessive, the evaluating Court should remember that "'[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment." Id. (quoting Johnson v. Glick, 481 F.3d 1028, 1033 (2d Cir. 1973)).

- A. <u>Whether Plaintiff has demonstrated a causal connection between his injury and the Officers' use of force</u>

Plaintiff produced thirty-one pages of medical records documenting his hospitalization after the incident. (Dkt. # 34–4.) However, Plaintiff does not demonstrate that the head injury for which he was treated was caused directly and only by a clearly excessive use of force. In fact, Plaintiff presents no testimony, expert or otherwise, as to how the injury occurred.

Even viewed in the light most favorable to the Plaintiff, there is no evidence that any Defendant struck Plaintiff in the head. While it is possible that the injury occurred when Defendants brought him to the ground to handcuff him, Plaintiff does not introduce any evidence to draw a causal connection between hitting the ground and the head injury he sustained. Further, the act of bringing Plaintiff to the ground was a reasonable use of force under the circumstances, and was not clearly excessive. Accordingly, Plaintiff has failed to demonstrate that he suffered an injury that resulted directly and only from a clearly excessive use of force.

B. <u>Whether Plaintiff has demonstrated that the use of force was clearly unreasonable</u>

Plaintiff's summary judgment evidence includes the reports each Defendant wrote immediately after the incident. ("Davidson Rep.," Dkt. # 34-5; "Marte Rep.," Dkt. # 34-6; "Kerwath Rep.," Dkt. # 34-7.) Officers Davidson and Kerwath reported that they had been dispatched to an assault in progress. (Davidson Rep. at 1, 3; Kerwath Rep. at 2.) Officer Marte states that he was near Plaintiff's residence when he heard the dispatcher giving a call regarding an assault in progress, and decided to go help. (Marte Rep.) Plaintiff does not dispute that his father called the police after receiving Ms. Matthews' phone call.

As each officer's recollection of the incident differs slightly from that presented in Ms. Matthews' deposition testimony, this Court will analyze the incident in the light most favorable to the Plaintiff, as relayed from Ms. Matthews' perspective. See <u>Marcantel</u>, 567 F.3d at 161 (finding that the evidence most favorable to the plaintiffs should be used to evaluate a qualified immunity claim at the summary judgment stage). Ms. Matthews stated that Plaintiff had let go of her immediately before she emerged from the front door; however, the Plaintiff followed her out the door, and she was visibly crying and had tears streaming down her face. Reasonable officers dispatched to an assault in progress and coming upon this scene could reasonably believe that they were witnessing an assault.

The officers could have then reasonably believed that the Plaintiff needed to be handcuffed for the safety of Ms. Matthews. While it may be clear in hindsight that Plaintiff was having a mental episode and should not have been brought to the ground while he was being handcuffed, the officers here were "forced to make [a] split-second judgment[ ]—in circumstances that [were] tense, uncertain, and rapidly evolving—about the amount of force that [was] necessary" in the situation. Graham, 490 U.S. at 397; see also Ontiveros, 564 F.3d at 382 (declaring that an officer's use of force "is presumptively reasonable when the officer has reason to believe that the suspect poses a threat of serious harm to the officer or to others" (quoting Mace v. City of Palestine, 333 F.3d 621, 623 (5th Cir. 2003))). Accordingly, Plaintiff has not demonstrated that the force used against him was clearly unreasonable at the time it was used.

Plaintiff has failed to show that the officers' use of force objectively caused Plaintiff's injuries, or that the officers' actions were clearly unreasonable. Accordingly, the Magistrate correctly concluded that the Defendants are entitled to qualified immunity on Plaintiff's excessive force claims.

II. Intentional Tort Claims

Mathews' complaint also seeks damages under state law for assault and battery. (Compl. ¶¶ 22–26.) Section § 101.106(f) of the Texas Civil Practice and Remedies Code requires that a suit against a governmental employee, "based

15

on conduct within the general scope of that employee's employment . . . [which] could have been brought under [the Tort Claims] chapter against the governmental unit . . . is considered to be against the employee in the employee's official capacity only." Tex. Civ. Prac. & Rem. Code § 101.106(f).  This is true even where the Texas Tort Claims Act has not waived immunity to suit as to a particular claim.  <u>Franka v. Velasquez</u>, 332 S.W.3d 367, 375 (Tex. 2011); <u>see also</u> <u>Tipps v. McCraw</u>, 945 F. Supp. 2d 761, 767 (W.D. Tex. 2013) (explaining that the "statute strongly favors dismissal of government employees").  Where the conduct at issue occurs in the course of officers' "exercise of their delegated duties,"—here, responding to an early-morning call for assistance—the claim for assault and battery certainly arises from Defendants' exercise of their delegated duties.  <u>Herrera v. Aguilar</u>, No. SA–10–CV–569, 2013 WL 7584125, at *4 (W.D. Tex., Sept. 6, 2013).  Accordingly, the Court finds that the Magistrate Judge's conclusion that Plaintiff's state law claims must be dismissed, is reasonable and absent of clear error.

CONCLUSION

For the reasons given, the Court **ADOPTS** the conclusions of the Magistrate Judge's Report and Recommendation (Dkt. # 37).  The Defendant's

Motion for Summary Judgment (Dkt. # 30) is **GRANTED** and the Court

**ORDERS** this case **DISMISSED WITHOUT PREJUDICE**.

    **IT IS SO ORDERED.**

    **DATE:** San Antonio, Texas, March 21, 2016.

    David Alan Ezra
    Senior United States Distict Judge